UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
KELLY ADAMS,

       Plaintiff,       **MEMORANDUM & ORDER**

  -against-         Civil Action No. 07-3512
                (DRH)(WDW)
CANON USA, INC.

       Defendant.
-------------------------------------------------------------X

**Appearances:**

**Law Offices of Lee Nuwesra**
Attorneys for Plaintiff
1623 Union Port Road, Suite 101
Bronx, New York 10462
By: Lee Nuwesra, Esq.

**Seyfarth Shaw LLP**
Attorneys for Defendant
620 Eighth Avenue
New York, New York
By: Dov Kesselman, Esq.
   Alysa M Barancik, Esq.


**HURLEY, Senior District Judge:**

   Plaintiff Kelly Adams ("Plaintiff" or "Adams") commenced this action alleging she was

the victim of sex discrimination and retaliation and asserting claims pursuant to Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq., and the New York Human

Rights Law, N.Y. Exec. Law § 290 et seq.[1]  Presently before the Court is the motion of defendant

Canon USA, Inc. ("Defendant" or "Canon") for summary judgment.  For the reasons set forth

---

[1]  Plaintiff's claim under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, et seq., was dismissed by stipulation of the parties.

below, the motion is granted.

## Factual Background

The following facts are undisputed[2] unless otherwise noted:

## Canon and its Sales Structure

Canon sells and services Canon brand professional business and consumer imaging equipment and information systems, including printers, image filing systems, facsimile machines, cameras and other products. It is headquartered in Lake Success, New York and has regional offices throughout the United States. ( Def. Statement of Undisputed Material Facts Pursuant to Local R. 56.1 ("Def. 56.1") ¶ 1.[3] It maintains an equal employment opportunity policy which prohibits discrimination and harassment on the basis of sex and any other protected

---

[2] Local Rule of Civil Procedure 56.1 of the U.S. District Court for the Eastern District of New York ("Rule 56.1") requires parties moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to admissible evidence in the record supporting each such fact. *See* Rule 56.1(a) & (d). Rule 56.1 further provides that parties opposing a motion for summary judgment must include a statement with correspondingly numbered paragraphs either admitting or denying the moving party's statement and to the extent any statement is denied, the citation to the record evidence which supports the denial. *See* Rule 56.1(b), (c) & (d). Where the party opposing the motion fails to controvert the facts set forth in the movant's Rule 56.1 statement, those facts will be deemed admitted so long as supported by the admissible evidence — although they will not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003), *and Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). In this case, Plaintiff responded "denied," "denied in part," or "admitted in part" to quite a number of Defendant's statements without any citation to record evidence. To the extent Plaintiff failed to provide record citations to support her complete or partial denials, the Court has deemed the statements admitted insofar as Defendant supported its statements with admissible evidence. The Court nonetheless reviewed the evidence submitted by Plaintiff searching for evidence supporting Plaintiff's denials, whether complete or partial, and found none.

[3] When only one party's 56.1 statement is cited, without an indication that the statement is contested, the referenced statement is admitted or deemed admitted.

classification. The policy advises employees to report discrimination so that it can be appropriately dealt with and prohibits retaliation. Plaintiff received a copy of the policy at the commencement of her employment and participated in an orientation at which Canon's policies and procedures, including the non-discrimination policy, were reviewed. (*Id.* ¶¶ 2-7.)

Canon sells its products to various dealers (referred to as "channels"), which then sell the products to end-users. For example, Canon sold its copiers and related products to large dealers such as IKON Office Solutions and DANKA, and small dealers, such as Gordon Flesh Solutions and Datamax; these dealers, large and small, then sell the Canon products to end-users. Canon also sells its products to Canon Business Solutions, Inc. and its predecessors ("CBS"). CBS is a subsidiary of Canon, as well as a customer. (Def. 56.1 ¶ 12.)

Canon employs District Account Executives ("DAEs") in its various sales channels. The DAEs are responsible for assisting the dealers with their sales efforts. Each DAE services only the particular channel to which the DAE is assigned. For example, Canon has DAEs that service only IKON and those employees are part of Canon's IKON channel. Similarly, Canon had dedicated DAEs that serviced only DANKA as part of the DANKA sales channel, a separate "Independent Dealers" sales channel, and a separate CBS channel, each of which has its own dedicated DAEs and sales force. The DAEs are employees of Canon, not the customers they support, and their jobs are to educate and support Canon's customers, such as IKON, Danka, and CBS, in the sale of Canon's products. Every sales channel also has its own manager, to whom the DAEs for that particular channel report. (Def. 56.1 ¶¶ 13-17.)

**Plaintiff's Employment With Canon and Promotion to the Position of DAE**

Plaintiff commenced her employment with Canon on April 22, 1996. (Def. 56.1 ¶ 8.)

She began as an Associate Field Instructor but was later promoted to Field Instructor and was based out of Canon's Jamesburg, New Jersey regional office. As a Field Instructor, Plaintiff trained Canon sales representatives, DAEs, and managers on how to use various products that Canon sold. (*Id.* ¶¶ 8-11.)

In or about June/July 2001, Plaintiff was asked by the manager (a male) of the DAEs in the CBS sales channel if she was interested in becoming a DAE for the CBS sales channel.[4] At that time, CBS was divided into four separate companies, each of which focused on different parts of the country: Canon Business Solutions-West, Inc. ("CBS-West"), Canon Business Solutions-Central, Inc. ("CBS-Central"), Canon Business Solutions-Northeast, Inc. (previously known as MCS Business Machines, Inc. ("MCS")) ("CBS-Northeast"), and Canon Business Solutions-Southeast, Inc. (previously known as Affiliated Business Solutions ("ABS"))("CBS-Southeast"). As their names suggest, CBS-West sold Canon products to the Western part of the United States, CBS-Central sold in the Central United States, CBS-Northeast sold in the Northeast United States and CBS-Southeast sold into the Southeast United States. Canon had an assigned DAE dedicated to support each of the four CBS companies along the same geographic lines and each DAE was responsible for servicing his/her own subsidiary region of CBS. The DAE position about which Plaintiff was approached was part of the Imaging System Group ("ISG") and was to service CBS-Southeast serving the Southeast United States. (Def. 56.1 ¶¶ 18-22.)

Plaintiff filled out a transfer application for the CBS-Southeast DAE position, was

---

[4] Apparently this was not the first time that someone suggested to Plaintiff that she apply for the position of DAE. (*See* Adams Decl. at ¶ 3.)

interviewed for the position, and ultimately started in the position on July 2, 2001.  As DAE Plaintiff was still "based out of" the Jamesburg office, although she, like the other DAEs, worked primarily out of her residence with Canon-supplied computers, printers, and other needed office equipment.  (Def. 56.1 ¶¶ 22-24; Sharp Dep. at 19-21.)   At the time she was hired, Brian Herbert ("Herbert") was already the DAE for CBS-West, John Smith ("Smith") was already the DAE for CBS-Central, and CBS-Northeast was an open position.  (Id. ¶ 25.)  Herbert was based out of Gardenia, California, where CBS-West had its headquarters and was responsible for servicing the entire CBS-West region.  Smith was based out of Schaumberg, Illinois, where CBS-Central had one of its offices and supported the entire CBS-Central region.   At the time of Plaintiff's hire, all of the DAE's supporting the various CBS channels reported to Mr. Cooke ("Cooke").  (Id. ¶¶ 26-28.)

As DAE for CBS-Southeast, Plaintiff worked directly with Katherine Loftis Farrell, CBS-Southeast's Vice President of Marketing.  (Def. 56.1 ¶ 33.)

**The Hiring of Peter Sharp as DAE for CBS-Northeast**

Peter Sharp ("Sharp") was hired by Canon as the DAE for CBS-Northeast on or about February 3, 2003.[5]  He also reported to Mr. Cooke.   Sharp was based out of Canon's Jamesburg, New Jersey office and supported the entire CBS-Northeast region, including its headquarters in New York City and the various paragon offices throughout the Northeast region.  At the time of Sharp's hiring, CBS-Northeast's Vice President of Marketing was Thomas Martocci ("Martocci").  As the DAE servicing CBS-Northeast, Sharp worked directly with Martocci. Sharp knew Martocci prior to becoming a DAE.  (Def. 56.1 ¶¶ 29-32.)  Sharp had previously

_____

[5]Plaintiff maintains that she "was initially entrusted" to train Sharp.  (Adams Decl. at ¶ 2.)

worked at CBS-Northeast in both a graphic sales position and a sales training position where he

ultimately reported to Martocci. (Sharp. Dep. at 47.) Indeed, Martocci encouraged Sharp to

apply for the Canon DAE position. (Def. 56.1 ¶ 32.)

**CBS-Northeast and CBS-Southeast Merge to Form CBS-East, Inc.**

In or about November 2003, CBS-Northeast and CBS-Southeast merged to form Canon

Business Solutions-East, Inc. ("CBS-East") and Martocci became the Vice President of

Marketing for CBS-East, which then encompassed the entire Eastern region of the United States,

including both Sharp's northeast region and Plaintiff's southeast region. (Def. 56.1 ¶ 34.) Thus,

Plaintiff began providing sales and marketing support services to Martocci instead of Loftis

Farrell. (*Id.* ¶¶ 35-36.) As Vice President for Marketing for CBS-East, Martocci was the most

senior level customer contact for Plaintiff and Sharp.[6] Martocci worked out of the Midtown

Manhattan CBS-East office, which Sharp supported. While Plaintiff did not provide support to

the CBS-East Midtown Manhattan office, except perhaps when covering for Sharp, after the

formation of CBS-East she visited that office on a monthly basis to meet with Martocci regarding

her Southeast region. (*Id.* ¶¶ 37-39.)

As the two DAEs for CBS-East, Plaintiff and Sharp continued to cover the geographic

regions that they had prior to the merger. Plaintiff's coverage area was Burlington, New Jersey;

Delmarva Branch in Wilmington, Delaware; Horsham Branch in Horsham, Pennsylvania;

Philadelphia Branch in Philadelphia, Pennsylvania; Washington, D.C. branch in Arlington,

---

[6] At no time did Plaintiff or Sharp, as Canon employees, report to Martocci, an employee of CBS-East; rather, Martocci was considered a customer. Defendants contend that Martocci had no say over either Plaintiff's or Sharp's compensation or employment. Plaintiff alleges that Martocci was not only influential in getting Sharp his position as DAE, he was influential in getting rid of Plaintiff.

Virginia; Baltimore Branch in Ellicot City, Maryland; Vienna Branch in Vienna, Virginia; Atlanta Branch in Norcross, Georgia; Orlando Branch in Orlando, Florida; Tampa Branch in Tampa, Florida; Miami/Ft. Lauderdale Branch in Weston, Florida; and Miami Branch in Miami, Florida.[7]  Sharp's coverage area was Midtown Branch (which included Midtown East and Midtown West) in New York, New York; M031 Branch in New York, New York; Lake Success Branch, in Lake Success, New York; Paramus Branch in Paramus, New Jersey; Cranford Branch in Cranford, New Jersey; White Plains Branch in White Plains, New York; Pittsburgh Branch in Moon Township, Pennsylvania; Detroit Branch in Southfield, Michigan; and Cincinnati Branch in Mason, Ohio.  In 2005, Sharp's Northeast territory represented 57% of the CBS-East sales revenue, while Plaintiff's southeast territory represented 43% of the sales revenue.  (Def. 56.1 ¶¶ 41-42.)

**Change in Canon Management for the CBS Sales Channel**

In early 2004, Ms. Bernadette Piccione ("Piccione") replaced Cooke as manager for the CBS channel and thus became the manager of the CBS DAEs, to wit, Plaintiff, Smith, Herbert, and Sharp.  (Def. 56.1 ¶ 44.)  According to Plaintiff, sometime shortly before November 2005, Piccione told the CBS DAEs that the positions of all four DAEs were in jeopardy as a result of impending restructuring.  (Adams Decl. at ¶¶ 10-12.)  After Todd Pike[8] ("Pike") learned of this

---

[7]  Plaintiff contends that she had the "biggest geographic territory with the largest overnight stays amongst all four DAEs," including Sharp.  (Pl.'s 56.1 Statement at ¶ 41.) Other than her conclusory deposition testimony, she offers no support for this contention.  More particularly, she provides no information as to the geographic territory of the other two DAEs or as to the number of overnight stays that each DAE had in a specific period.

[8]  The parties do not identify the position held by Pike, although it appears that during the relevant time period he held a position in upper management.

revelation, he reassured all four that their jobs were secure.  In or about early November 2005, the four CBS DAEs learned in a conference call that Ms. Tracie Sokol ("Sokol") was replacing Piccione, at least temporarily, as manager for the CBS channel.  Plaintiff was happy with Sokol's appointment as manager of the DAEs for the CBS channel because she had worked with her while a Sales Trainer in Marketing and they had a good relationship.  (Def. 56.1 ¶¶ 45-48.)

In January 2006, Sokol met with the four DAEs servicing the CBS channel during a Canon national meeting held in Florida.  At that time, she discussed her objectives and goals for the CBS DAE team, including the importance of communication by the DAEs with the client and with her, the importance of providing "value added" service, the type of support they were expected to provide, and the type of documentation she expected from the DAEs on a regular basis.   She also presented a document which summarized how she viewed the role of the DAEs for the CBS channel.  (Def. 56.1 ¶¶ 49-52.)

### Decision to Restructure DAEs Supporting CBS-East

In early 2006, shortly after becoming the manager of Canon's CBS sales channel, Sokol looked at the DAEs supporting the CBS sales channel to determine whether the coverage strategy was being maximized.  With the merger of CBS-Northeast and CBS-Southeast into CBS-East, Sokol felt that there was significant duplication of effort between the "Philadelphia"  territory and the "New York" territory with two people calling on now a single Vice President of Marketing (Martocci) who was located in New York.[9]  (Def. 56.1 ¶¶ 53-55.)  Also, as both CBS-West and CBS-Central were staffed by one DAE each, Sokol believed that with the merger of CBS-Northeast and CBS-Southeast into one combined entity, CBS-East, it was appropriate to

---

[9]  Fiscal considerations, however, did not play a part in the decision.  (Sokol Dep. at 149.)

have only one DAE servicing CBS-East. Accordingly Sokol recommended, and Pike approved, the elimination of one of the two DAE positions supporting CBS-East. Sokol and Pike were the only two individuals who had any input regarding the restructuring of the DAE positions supporting CBS-East. (*Id.* ¶¶ 56-58.)

**The Decision to Retain Sharp over Plaintiff as the DAE for CBS-East**

The decision whether to retain Plaintiff or Sharp as the sole DAE supporting CBS-East was made by Sokol.[10] (Sokol Decl. ¶ 13.) Sokol did not consider Smith and Herbert in the termination decision since they were in different regions, supporting different companies, and at the time the decision was being considered did not overlap with Sharp or Plaintiff. (Def. 56.1 ¶ 60.) In deciding whether to retain Plaintiff or Sharp, Sokol evaluated their respective relationship with the customer, as well as what she knew of their respective experience and credentials. She also considered each individual's product knowledge, effectiveness and sales skills. She did not review either Sharp's or Plaintiff's personnel file. (Id. ¶ 62; Sokol Dep. 116-18.)

Sokol compared Plaintiff's and Sharp's interpersonal relationship with Martocci, the principal customer with whom they both had worked. Plaintiff found Martocci "harsh" in the way he spoke and complained that he "cursed" and would scream at those whose ideas he disagreed. Plaintiff explained to Sokol and Sharp that she felt uncomfortable by Martocci's style, but never suggested that his treatment of her was because of her sex. Sokol was aware that

---

[10] Plaintiff contends that "[a]t least Mr. Pike also contribute to this decision." (Pl.'s 56.1 Statement at ¶ 59.) However, the deposition pages she cites (Sokol Dep. at 124; Miller Dep. at 12) only support the proposition that Pike participated in the decision as to the elimination of a DAE position for CBS-East and not that Pike participated in the decision as to whether Plaintiff or Sharp should be retained. He did, however, approve Sokol's decision.

9

Plaintiff was uncomfortable in working with Martocci as Plaintiff had called Sokol on a couple of occasions regarding working with Martocci and told Sokol that Martocci intimidated her, yelled at her, and bullied her, and that she could not work with him comfortably.[11] Plaintiff admits that Martocci did not speak to her or treat her any differently than he treated Sharp; Martocci talked to both Plaintiff and Sharp in the same manner. Plaintiff also admits that she did not feel that Martocci's harsh manner had anything to do with the fact she was a woman and that he never made a negative or disparaging comment towards Plaintiff because she was a woman or about her being a woman. While Plaintiff's relationship with Martocci was initially very good, it became more gruff and Martocci yelled more after Piccione became Plaintiff's manager because he and Piccione did not get along with each other and his issues with Piccione may have spilled over to his relationship with Plaintiff. Sharp also witnessed Plaintiff's discomfort with Mr. Martocci's style. Plaintiff became flustered by Martocci and she told Sharp that Martocci made her nervous and she did not like him, in part because of his cursing. (Def. 56.1 ¶¶ 63-71.)

Sharp, in contrast, never complained of any difficulties or problems with Martocci's style. In fact, Sharp had previously worked for and reported[12] to Martocci when Sharp worked at a predecessor company of CBS-Northeast. Sokol noted that Sharp appeared to more effectively

---

[11] According to Plaintiff's Declaration she began to "experience hostility" by Martocci and, between December 2006 and April 2007, "his abusive and demeaning behavior towards [her] became intolerable. Accordingly pursuant to [Canon's] Policy, [she] complained to [] Sokol." (Adams Decl. ¶ 13.)

[12] Plaintiff disputes that Sharp ever reported to Martocci. However, at his deposition Sharp testified that in his capacity as a DAE he never reported directly to Martocci but that Martocci did for a time "supervise" him when he (Sharp) worked in the Sales Training Group at CBS-Northeast; while in the Sales Training Group, Sharp reported to Gloria Riehl who reported to Martocci. (Sharp Dep. at 47.)

communicate with Martocci than Plaintiff.  (Def. 56.1 ¶¶ 72-72.)  For example, on March 28, 2006, Sharp forwarded via email a presentation to Martocci, on which he copied Sokol and others.  Sokol subsequently forwarded that email to Plaintiff, asking whether she had a similar presentation for Martocci.  Plaintiff advised Sokol she had not prepared such a presentation but could put one together.  Sokol responded that "this is an example of the value we spoke about. [Sharp] prepared a review of what he did in the first quarter . . . . I am not sure how you communicate the same if you do not prepare this type of document.  We discussed the need of keeping CBS in the loop of our activities regularly and getting their direction.  This is probably a good basic way to . . . show [Martocci] and his group what you have been doing. . . ."  (Ex. L to Kesselman Decl.; Def. 56.1 ¶¶ 75 & 76.)  In considering the decision of whether to retain Plaintiff or Sharp, Sokol also casually communicated with Martocci to gauge his views of the two DAEs without advising him of the reason for her inquiry.  The conversation confirmed that Sharp had a better relationship with Martocci and could be more effective in dealing with and servicing this customer.  (*Id.* ¶ 78.)

Canon apparently has no policy that states that terminations will be based on length of service.  (Def. 56.1 ¶ 82.)  For purposes of benefits and other non-termination related issues, Canon calculates "length of service" as cumulative employment with Canon and any Canon affiliate.  (*Id.* ¶ 82.)  In making her determination Sokol checked Plaintiff's and Sharp's length of service with Cannon and its affiliates.   Although Sharp was hired by Canon as a DAE on or about February 3, 2003, he had worked at MCS (the predecessor of CBS-Northeast and a Canon subsidiary) since January 1997.  Taking into account that cumulative service, Sokol determined that their length of service was essentially the same; Sharp had nine and one half years of service

(January 1997 to May 2006)[13] while Plaintiff had ten years of service (April 22, 1996 to May 2006).[14]  (*Id.* ¶¶ 81, 83-84.)

Sokol also knew that Sharp had a lengthier background in sales, had previously worked for MCS/CBS-Northeast, and had some management and sales experience.  (Def. 56.1 ¶ 85.)  In fact, Sharp had nearly eleven years of sales experience including two and one half years of working in sales at MCS.  (*Id.* ¶ 86.)  As a result of having previously worked with Plaintiff, Sokol knew that Plaintiff's background at Canon was as a Field Instructor/Sales Trainer, which position focused on training sales representatives but not typically the direct sales of products.  Prior to her Canon employment, Plaintiff's sales experience was limited to approximately two years as an Associate Account Representative for Xerox and three years as a Document Training Representative for Xerox, wherein Plaintiff's principal role was to sell training to a customer after the customer had already purchased a machine.  (*Id.* ¶¶ 87-88.)  Plaintiff admits that Sharp had longer and greater experience at direct sales than she, and that she did not know how her sales skills compared to Sharp's.  (*Id.* ¶ 91.)

Finally, Plaintiff and Sharp had nearly identical performance ratings.  They were both rated "Meets Expectations" in their 2004 and 2005 reviews.[15]  (Def. 56.1 ¶ 92.)

Defendant contends that based on the above considerations Sokol chose to retain Sharp

---

[13] Excluding his employment at Canon affiliates, Sharp's length of service at Canon was 3 years and 4 months at the time of Plaintiff's termination.

[14] Although Plaintiff does not dispute that length of service is calculated for many purposes as the cumulative length of service with Canon and its affiliates, she points out that insofar as length of employment with Canon only, she had seven years more seniority than Sharp.

[15] Canon does not contend that the decision to terminate Plaintiff was based on performance issues.

over Plaintiff for the CBS-East position and to terminate Plaintiff's employment in or around March 2006. However, because Sokol learned that Plaintiff's mother had passed away at approximately the same time, she decided to wait to advise Plaintiff of the decision until late May 2006. (De. 56.1 ¶ 93.) Plaintiff disputes this, referring to the fact that the only reason for plaintiff's termination on May 31, 2006 given by Sokol and Mindy Miller-Roesch ("Miller-Roesch"), a human resources person in attendance at the termination, was "duplication and consolidation." Plaintiff also contends that there was testimony that her position was not in jeopardy "through at least April 2006." (Pl. 56.1 at ¶ 93.)

**Termination of Plaintiff's Employment**

On or about May 26, 2006, Sokol called Plaintiff and asked her to attend a meeting at Canon's headquarters in Lake Success, where Sokol worked, on May 31, 2006. On May 31, 2006, Plaintiff, Sokol and Miller-Roesch met. Sokol and Miller-Roesch explained that the group was undergoing a restructuring, that there was overlap between Plaintiff and Sharp, and that, as a result, Plaintiff's employment was being terminated as part of this restructuring. Miller-Roesch then explained the different severances and other benefits available to Plaintiff and provided Plaintiff with a severance agreement. The severance agreement explicitly stated that Plaintiff was eligible for a severance package "as a result of a restructuring in the ISG division." (Def. 56.1 ¶¶ 94-97.) During the meeting Plaintiff asked why she was selected instead of Sharp, even though she had more tenure and supported Burlington. Sokol explained that Sharp was responsible for Manhattan, where Martocci was located. Plaintiff also asked during this meeting about a position previously held by a former DAE, Carl Dittman, which she thought was open. Miller-Roesch advised Plaintiff to contact Wendy Robinson ("Robinson"), the Human Resources

representative for Jamesburg (out of which Mr. Dittman had been based) to ask her for any openings. Plaintiff did not ask Miller-Roesch if she could apply for this open position. During the meeting, Plaintiff did not accuse Sokol or Miller-Roesch of discrimination and does not even know whether she believed Sokol or Miller-Roesch retained Sharp because of his sex. (*Id.* ¶¶ 98-100.)

### Plaintiff's Post-Termination Complaint of Discrimination

Plaintiff never complained about discrimination to Human Resources, Robinson, Miller-Roesch, Sokol or anyone else at Canon during her employment. (Def. 56.1 ¶ 101.) As noted earlier, she did complain to Sokol about the way Martocci spoke to her; however, she never claimed he spoke to her the way he did because of her sex. After her termination, on or about June 19, 2006, Plaintiff's attorney sent a letter to Miller-Roesch advising that he was retained "to attempt an amicable resolution of certain outstanding employment issues relating to [Plaintiff's] termination" and "rejecting the proposed terms and conditions offered under the 'Special Severance Notice' . . . ." The letter continues:

> It is Ms. Adams' contention, amongst others, that your Company has discriminated against her on the basis of her sex, when other male employees with less experience and qualifications were retained in her stead. It is also Ms. Adams' contention that her termination was unlawful and in violation of Canon's policies and procedures.
> Accordingly, Ms. Adams is seeking her full earned bonus, reinstatement to her former position or a similar position, as well as being made whole.
> In the event that the foregoing is not acceptable, then contact the undersigned . . . by no later than July 7, 2006 to discuss an alternative amicable resolution(s).
> Finally, please have all future communications regarding this matter forwarded through our offices.

14

(Ex. S to Kesselman Decl.; *see also* Def. 56.1 ¶¶ 102-03.)

Miller Roesch sent a copy of the letter to Canon's in-house counsel.[16]  She also sent an email to her supervisor, the head of Human Resources, informing him that Canon had received Plaintiff's counsel's letter.  No other individual was copied or blind copied on the letter.  Miller-Roesch did not show the letter to anyone else at Canon, nor did she advise anyone else about it.  Plaintiff did not tell anyone at Canon about her attorney's letter.  (Def. 56/1 ¶¶ 104-08.)

At no time after her lawyer's June 16, 2006 letter did Plaintiff personally apply for or inquire about any open position with Canon.  (Def. 56.1 ¶ 110.)

**Post-Termination Events**

Approximately four to five days after her termination on May 31, 2006, Plaintiff called Robinson and asked whether there were any openings.[17]  Robinson advised her that there were not.  Plaintiff did not ask if Mr. Dittman's position was still available.  (Def. 56.1 ¶¶ 114-15.)  At no time after this telephone conversation did Plaintiff personally contact anyone at Canon to follow-up on openings.  No one at Canon ever told Plaintiff that if any opening came up she could not apply for it.  Indeed, Plaintiff understood that if she did not sign the severance

---

[16] Canon's in-house counsel responded by letter dated June 30, 2006 indicating that she would speak with Plaintiff's counsel regarding the June 19, 2006 letter.  The record contains only one further piece of correspondence between Canon's in-house counsel and Plaintiff's counsel.  It is a letter, dated July 10, 2006, from Plaintiff's counsel to Canon's counsel containing the legend "Confidential for Settlement Purposes Only."  After setting forth his understanding that Canon intends to negotiate in good faith a possible resolution, Plaintiff's counsel writes: "It is also my understanding that Canon U.S.A. is not willing, at this time, to reinstate Ms. Adams to her previous position or another suitable position."  He then continues on to set forth Plaintiff's settlement demand.  (*See* Ex. 10 to Adams Decl.)

[17] According to Plaintiff, her call to Robinson was prompted by a call from Sharp advising Plaintiff that it was announced that CBS was expanding rather than downsizing.  (Adams Decl. at ¶ 20; Pl.'s Mem. in Opp. at 6.)

agreement she was provided with at the termination meeting, she would be permitted to apply for jobs at Canon or any of its affiliates. On or about July 5, 2006, Plaintiff went onto Canon's publicly available website and found a job posting for a DAE position at Canon that would be located out of "Jamesburg NJ CT MA." This position was not a CBS channel position. Plaintiff neither personally applied for this position nor called anyone at Canon to inquire about it. The position was filled in or about October 2006 by a woman, Mary Ann Fido, an external candidate. Similarly, another DAE position previously held by Mr. Dittman, of which plaintiff was aware, was also filled by a woman, Dori Cocoros, another external candidate, in or about March 2007. Plaintiff did not personally apply for this position either. (Def. 56.1 ¶¶ 116-22.) As to both these positions, Plaintiff asserts that she "applied' for them via her attorney's demand, in his letter of June 2006, that she be reinstated to her former position or a similar position. (Def. 56.2 ¶ 122; Pl. 56.1 ¶¶ 122, 136.)

After Plaintiff's termination, Sharp, as the exclusive DAE for CBS-East, began supporting all CBS-East locations, including the locations previously supported by Plaintiff. (Def. 56.1 ¶ 123.) He continued to support all of Plaintiff's territory until in or about January 2007 when, as discussed in more detail below, a DAE was hired to cover Georgia and Florida.[18]

In June 2006, another restructuring took place at Canon, with the Office Products Division ("OPD") being eliminated and its responsibilities merged back into the Independent Dealers channel. Sokol had no knowledge of the OPD restructuring prior to learning of it in June

---

[18] Citing Sharp's deposition testimony, Plaintiff contends that after her termination Canon assigned Cincinnati, Detroit and Pittsburg, which had previously been part of Sharp's territory, to one of the other male DAEs. (Pl.'s Mem. in Opp. at 8 (citing Sharp Dep. at 24-25).) However, the cited testimony does not mention Cincinnati, Detroit or Pittsburgh.

2006. Which is to say, she did not know of the restructuring at the time of Plaintiff's termination. (Def. ¶¶ 124-25.)

At the time of the restructuring, Alicata was the National Sales Manager for Canon's OPD and supervised approximately nine DAEs who supported OPD, including John Edwards ("Edwards") and Lisa Malone Beebe ("Beebe"). (Def. 56.1 ¶¶ 112, 126.) In connection with the elimination of the OPD Division, and at the instruction of Alicata's manager, Nancy Langdale, five of the nine DAEs supporting OPD were terminated. Of the remaining four, three, including Beebe, were transferred to the Independent Dealers channel. The fourth, Mr. Edwards, who was based out of Dallas, began supporting CBS-Central in the Texas area as part of the CBS sales channel. (*Id.* ¶ 127.) At approximately the same time, i.e., July 2006, Joseph Alicata ("Alicata") was transferred from OPD to become the National Sales Manager overseeing the DAEs supporting the CBS sales channel. As the manager of the CBS channel DAEs, he was responsible from that point through February 2008 for recommending who to hire as DAEs supporting the CBS channel. (*Id.* ¶ 112.) He reported to Sokol. Alicata never learned of the letter from Plaintiff's counsel or Plaintiff's EEOC complaint at any time prior to receiving a notice of deposition in the instant case. (*Id.* ¶ 113.)

At about the same time as the OPD restructuring, Uinta Business Systems, Inc. ("Uinta"), an independent dealer of printer products located in Salt Lake City, Utah and Las Vegas, Nevada was acquired and became part of the Canon Business Solutions family of companies. Prior to its acquisition, Uinta was part of the Independent Dealers sales channel. After its acquisition, Uinta became Canon Business Solutions-Mountain West Inc. ("CBS-Mountain") and Harry Bolter, who was the DAE that supported Uinta as part of the Independent Dealers sales channel, was

transferred into the CBS channel in order to continue to support Uinta. He supported CBS-Mountain both in Utah and Nevada, as well as in Phoenix, Arizona, and Denver, Colorado. (Def. 56.1 ¶¶ 130-32.)

Canon did not recruit for the DAE positions within the CBS channel held by Bolter and Edwards, nor were they open positions that Canon had been seeking to fill; rather Bolter and Edwards became DAEs in the CBS channel as a result of their unique business circumstances. Neither Bolter nor Edwards had any responsibilities towards CBS-East or the regions Plaintiff previously supported. (Def. 56.1 ¶¶ 133-34.)

On or about July 19, 2006, a joint memorandum was issued by the then Executive Vice president and Chief Operating officer of Canon, together with the presidents of CBS-East, CBS-Central and CBS-West, announcing the aforementioned restructuring and listing the five DAEs now within the CBS Channel, to wit, existing DAEs Sharp, Smith, and Herbert, and transfer DAEs Bolter and Edwards. After learning of the expanded number of DAEs, Plaintiff did not personally call anyone at Canon and advise them of her interest in applying for one of the positions. (Def. 56.1 ¶¶ 135-36; Pl. 56.1 ¶ 136.)

Shortly thereafter, on or about July 28, 2006, Alicata prepared a requisition form to open a new DAE position within the CBS channel to cover Florida and Georgia locations. Canon posted and recruited for this position beginning in or about August 2006. (Def. 56.1 ¶ 137.) Beebe, who had worked with Alicata while in OPD and who had been moved to the Independent channel after the OPD restructuring, applied for the position, was interviewed by Alicata, who then determined she was the best candidate and recommended she be hired. She was hired and began her new duties in or about January 2007. (*Id.* ¶ 138.) Alicata's recommendation was

approved by Sokol and Pike. When he recruited for this position, Alicata was not aware whether Plaintiff was interested in it or a similar position. Indeed, Plaintiff had and continued to have a good relationship with Alicata and believes he always treated her fairly; he never made any discriminatory or derogatory comments toward Plaintiff. (Id. ¶¶ 139-40.)

The only other DAE hired by Alicata was in or about February 2008 when he hired Joe Macfarlan, an outside candidate, as a DAE in the CBS channel based out of the Burlington, New Jersey area and responsible for supporting several of the CBS-East offices Plaintiff previously supported. The position was posted. Plaintiff did not personally apply for it. (Def. 56.1 ¶¶ 145-47; Pl. 56.1 ¶ 136.)

In January 2008, Christine Sedlacek ("Sedlacek") took over a portion of Alicata's responsibilities with respect to managing the group that supported the CBS channel. Alicata then moved to a different position in February 2008 at which time Sedlacek replaced Alicata as manager of that group. (Def. 56.1 ¶ 148.)

**Institution of this Action**

Plaintiff filed a Charge of Discrimination with the EEOC on October 10, 2006. The EEOC issued a right to sue letter on May 23, 2007. On August 22, 2007, Plaintiff filed the complaint in this case. (Def. 56.1 ¶¶ 180, 182.)

Discussion

**I. Summary Judgment Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's

entitlement to judgment as a matter of law.  *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir. 2008); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *See SCR Joint Venture*, 559 F.3d at 137; *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried.  *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations

omitted).  Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein."  *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)).  "Rule 56(e)'s requirement the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."  *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case."  *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion.  *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).  Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim.  *See id.* at 210-11.  Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'"  *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

21

In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). That being said, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings. *See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also* Fed. R. Civ. P. 56(e). More particularly, although "summary judgment should be used sparingly" in cases where the material fact at issue is the defendant's intent or motivation, the plaintiff must nevertheless offer some "concrete evidence" in his favor, and is "not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[W]hen an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Williams v. City of New York*, 2005 WL 839103, at *4 (S.D.N.Y. Apr. 15, 2005) (citing cases); *see also Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (Summary judgment is appropriate when there is "a lack of evidence in support of the plaintiff's position or the evidence [is] so overwhelmingly tilted in one direction that any contrary finding would constitute clear error."). To defeat summary judgment "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the

22

defendant's employment decision was more likely than no based in whole or in part on discrimination."  *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997).

## II.  The McDonnell-Douglas Burden-Shifting Methodology

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (West 1994).  Within this provision, it is unlawful to "fail or refuse to hire" an individual based on the above categories.  *Id.*

In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence.  This standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-11 (1993).

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

To establish a prima facie case of discrimination, a plaintiff must show that: (1) she belonged to a protected class, (2) was qualified for the position she held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*, 759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. 2004). Federal courts do not have a "roving commission to review business judgments," *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). A discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner-Lambert Co.*, 142 F. Supp. 2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)), *aff'd*, 9 Fed. Appx. 38 (2d Cir. 2001).

However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

## III. Sex Discrimination

The parties do not dispute that Plaintiff has satisfied the first three elements of a prima facie case, i.e. she belongs to a protected class, was qualified for the position she held, and suffered an adverse employment action. They do dispute whether the circumstances surrounding

Plaintiff's termination give rise to an inference of discriminatory intent. Plaintiff points to the fact that she "was let go while a male DAE was retained, who initially took over her duties." Defendants maintain there is no evidence that raises an inference of discrimination.

Although courts generally begin their analysis of a discrimination claim with an inquiry into whether a plaintiff has shown a prima facie case, "the issues surrounding the prima facie inquiry and those surrounding the pretext inquiry are not easily distinguishable, despite the apparent rigidity of the burden-shifting formula. Instead, the bottom line in a Title VII summary judgment motion is, simply, whether plaintiff has presented sufficient evidence from which a reasonable trier of fact could determine that defendants discriminated against [him.]" *Goldman v. Admin. for Children's Servs.*, 2007 WL 1552397, at *5 (S.D.N.Y. May 29, 2007). Therefore, the Court shall presume that Plaintiff has established a prima facie case and, since Defendant has articulated a legitimate, non-discriminatory reason for its decision to terminate her employment, proceed directly to the bottom line inquiry.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that there is insufficient evidence to permit a reasonable trier of fact to find that the Defendant's decision to terminate Plaintiff was discriminatory and, accordingly, Defendant is entitled to summary judgment.

Plaintiff relies heavily upon the fact she, a female, was terminated while the three DAEs retained were male. The evidence is clear, however, that the question was not which one of the four CBS DAEs should be terminated. Rather the question was whether Plaintiff or Sharp should be terminated in view of the consolidation of CBS-Northeast and CBS- Southeast into CBS-East. The DAEs for CBS-West and CBS-Central never entered into the equation and there

is no evidence to suggest that the reason they did not was the result of any discriminatory animus. Rather, the core, uncontested evidence makes clear that the reorganization resulting in CBS-East did not impact their territory or, more importantly their principal client contacts. Rather, the reorganization resulting in CBS-East impacted only Plaintiff and Sharp and therefore the decision was whether to retain either Sharp, a male, or Plaintiff, a female. In view of this limited universe, the fact that a male was retained over Plaintiff provides no evidence of discriminatory intent given the other attendant facts and circumstances present. *See Faldetta v. Lockheed Martin Corp.*, 2000 WL 1682759, at *7 (S.D.N.Y. Nov. 9, 2000). The decision to terminate Plaintiff was based on the relative sales skills she and Sharp possessed. Sharp admittedly had longer and greater sales experience than Plaintiff. *See Cramer v. Fedco Auto. Components Co.*, 2005 U.S. Dist. LEXIS 43933, * 40 (W.D.N.Y. Apr. 12, 2005) (where affected department consisted of three individual, one female and two males, termination of female did not reflect discriminatory animus given needs of department and female's more limited skills). As the Second Circuit has noted in analogous circumstances, "when a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualification ignored by an employer . . . the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person in the exercise of impartial judgment could have chosen the candidate selected over the plaintiff . . . ." *Byrnie v. Town of Cromwell Bds. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (citation omitted) (failure to promote case). Having reviewed the credentials of Plaintiff and Sharp, there is no objectively unreasonable disparity as would support an inference of pretext. *Cf. Ellenbogen v. Projection Video Servs.*, 2001 U.S. Dist. Lexis 8852, at *23 (S.D.N.Y. June 29, 2001).

Defendant also considered Plaintiff's and Sharp's relationship with Martocci. Plaintiff admittedly had problems with Martocci's rough manner. She even complained to Sokol about what she describes as his "abusive, bullying and harassing conduct." (Pl.'s Mem in Opp. at 5 (citing Adams Dep. at 168-69).) Plaintiff, however, never claimed that Martocci's conduct was discriminatory or that his harassment was motivated by her gender. Indeed, she concedes that he spoke to Sharp, a male, in the same manner. As Plaintiff's complaints about Martocci did not avert to gender, Defendant's consideration of Plaintiff's and Sharp's working relationship with Martocci raises no inference of discriminatory intent. *Cf. Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999) ("Title VII is not a general civility code") (internal quotations omitted); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (as plaintiff's complaints did not avert to gender, defendant could not have retaliated against her for complaining of gender discrimination); *Taylor v. Family Residences and Essential Enter.*, 2008 WL 268801, at *10 ("unfair, overbearing, or annoying treatment of an employee standing alone does not violate Title VII") (internal quotations omitted).

The Court also notes that the person who made the decision, or at the very least the recommendation, to terminate Plaintiff and who reviewed the relative qualifications of Sharp and Plaintiff and their respective relationship with Martocci, the senior customer contact was a woman, Sokol. The fact that the decisionmaker is a member of Plaintiff's protected class not only weakens any suggestion of discrimination but "strongly suggest[s] that invidious discrimination is unlikely . . . ." *Grady v. Affiliated Cent. Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *see Mathews v. Atria Huntington*, 499 F. Supp. 2d 258, 267-68 (E.D.N.Y. 2007); *Zuffante v. Elderplan, Inc.*, 2004 WL 744858, at *6 (S.D.N.Y. Mar. 31, 2004); *Pisana v. Merrill Lynch &*

*Co.*, 1995 WL 438715, at * 5 (S.D.N.Y. July 24, 1995).

Moreover, Plaintiff does not allege that any discriminatory remarks were ever made. (Def. 56.1 ¶ 152.) Plaintiff concedes that neither Sokol, Pike, Alicata, Bamba nor Martocci ever make any discriminatory comments towards her because she was a woman or about being a woman. Nor did she hear anyone else at Canon make such remarks. (*Id.* ¶¶ 153-56.) Plaintiff claims to have heard only the following three comments but admits none of them were discriminatory or made to or about the individual because she was a woman. Twice, Smith referred to Piccione as a "bitch" but Plaintiff admits that the comments represented only a personality conflict. (*Id.* ¶¶ 157-59.) The only other comment was that Piccione told Plaintiff that Martocci and two other employee of CBS-East had bet on her clothing because Plaintiff always wore black and white, and called her "goth." Plaintiff admits that "goth" is a fashion style, that she wears black and white quite a bit, that the comment was not about her being a woman, and that she was not aware of any comment by Martocci that disparaged Plaintiff because she was a woman. (*Id.* ¶¶ 160-61.)

Plaintiff was also never denied a promotion and it was Alicata, a male, who solicited her to apply for the position of DAE. (Def. 56.1 ¶ 163.) Plaintiff admits that she had worked with Sokol in the past, had a good relationship with her, never had any problems with her, and was happy with Sokol's appointment as her manager. Similarly, Plaintiff never had any problems with Pike or Alicata. Plaintiff admits that Cooke, her first manager while a DAE, was replaced by a woman, who was replaced by another woman; and that she knows of several women who were hired as DAEs. (*Id.* ¶¶ 149-51, 163.)

Although Plaintiff suggested in her deposition that she had to work harder than her male

colleagues as she was responsible for a larger territory which required more overnight stays, she admits that she does not believe she was given that territory because she was a woman. She also admitted that other than allegedly having to stay overnight more often than Sharp, Smith, and Herbert, her job was no harder than theirs. In fact, whoever held the DAE supporting the southeast region of CBS-East would have to travel, irrespective of gender and as the DAE responsible for the southeast region, Plaintiff was the person responsible for supporting new branches that opened within that region. (Def. 56.1 ¶¶ 164-66.) That Plaintiff's territory required more overnight stays does not give rise to an inference of discrimination.

Plaintiff also suggests that she should have been given the opportunity to compete for the position of manager for the CBS channel in June 2006, the position Alicata received, and that the failure to give her an opportunity to compete suggests discrimination. She admits that she was never a National Accounts Manager, a manager of sales at an organization, or a manager of DAEs for CBS. Alicata, on the other hand, had previously managed DAEs supporting the CBS customer beginning in approximately 1997, having worked as a National Sales Manager managing DAEs in other business lines, including OPD, and having managed sales organizations for approximately nine years prior to becoming the manager for the CBS sales channel in June 2006. Plaintiff also admits that she was unaware of whether Sharp or Smith were asked to interview for the job as manager of the CBS channel, but knows that Herbert was not asked to interview for the position. In fact, none of the remaining DAEs were considered or asked to become manager of the CBS channel. Plaintiff provides no evidence that she personally applied for the position of manager nor even that she had indicated an interest in moving to a managerial position at any time prior to her termination. (*See* Def. 56.1 ¶¶ 167-71.) In view of the above

30

evidence, Canon's failure to consider Plaintiff for the position of manager does not permit an inference of discrimination.

Plaintiff points to her conversation with Martocci on March 15, 2006 as evidence of discriminatory intent. In that conversation, Martocci told her that another male employee, Andy Bartolosi, the DAE supporting DANKA, wanted her job. Plaintiff admits, however, that Martocci had no authority to hire Bartolozzi to replace her. In fact Bartolosi was not hired. According to Plaintiff, Martocci mentioned this topic only once and did not focus on the fact that Bartolozzi was a male but rather on the fact that this person allegedly wanted her job. (Def. 56.1 ¶¶ 167-68.) The mere fact that someone else who happened to be male expressed an interest in her job or even undertook steps to get her job does not give rise to an inference of discrimination.

Plaintiff also maintains that the hiring of "new" DAEs after her termination is sufficient to permit an inference of discrimination. Plaintiff focuses principally on the fact that shortly after her termination a DAE position to cover Florida and Georgia locations was posted for Florida and Georgia locations. This evidence is insufficient to permit an inference of discrimination. It is undisputed that the position was filled by Beebe, a female, who had worked with Alicata while in OPD and who had been moved to the Independent channel after the OPD restructuring. In an effort nullify the fact that the position was filled by a female, Plaintiff points out that Beebe was not hired until after she filed her EEOC complaint. Nonetheless, the Court is unpersuaded that scenario gives rise to a material issue of fact in view of the evidence that other females were hired as DAEs, to wit, Mary Ann Fido was hired as a DAE in October 2006 and Dori Cocoros was hired in March 2007 to fill the position left vacant by Carl Dittman's departure. *See generally Pasha v. William M Mercer Consulting, Inc.*, 2004 U.S. Dist LEXIS

31

1226, at *20-21 (S.D.N.Y. Feb. 3, 2004) ("in determining whether discrimination was a motivating factor for an adverse employment decision, evidence of employer's non-discrimination should be considered as well") (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 513-14 (1993)).  Perhaps the result would be different had Plaintiff submitted evidence that the choice was between Beebe and one or more male candidates and Beebe was unqualified or significantly less qualified, but Plaintiff has not done so.

Turning then to the addition of Edwards and Bolter as DAEs supporting the CBS channel, no inference of discrimination arises therefrom given the undisputed facts surrounding their appointments.   It is undisputed that Bolter was transferred to the CBS channel because Uinta, which he had supported as DAE when it was part of the independent channel, was acquired by CBS.  His transfer allowed him to continue to support Uinta.   Edwards was transferred to the CBS channel when OPD was eliminated.  The fact that a male, Edwards, was transferred to another position when his job was eliminated, but Plaintiff, a female, was not does not give rise to an inference of discriminatory intent.  It is undisputed that the elimination of OPD resulted in the termination of five of the nine DAEs supporting OPD.  The remaining four, including Beebe, a female, were transferred.  *See generally id.*

Inasmuch as there is insufficient evidence to permit a rational trier of fact to conclude that Defendant's termination of Plaintiff was discriminatory, Defendant's motion for summary judgment is granted on the discrimination claim.

## IV.  Retaliation

### A.  The Standard

Title VII "forbids an employer to retaliate against an employee for, inter alia, complaining

of employment discrimination prohibited by Title VII." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-3(a)). Claims of retaliation pursuant to Title VII are analyzed according to the burden-shifting framework set forth in *McDonnell Douglas*. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003)

"In order to present a prima facie case of retaliation under Title VII . . . , a plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find [1] that []he engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'" *Id.* at 205-06 (brackets in original) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

The first element of the prima facie standard requires that Plaintiff have taken "action . . . to protest or oppose statutorily prohibited discrimination." *Cruz*, 202 F.3d at 566; *see Taylor*, 2008 WL 268801, at *13. This includes, for example "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see Cruz,* 202 F.3d at 566. Indeed, Title VII's protection against retaliation extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation "if for no other reason than . . . '[w]hen an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication 'virtually always'

33

constitutes the employee's opposition to the activity.' " *Crawford v. Metro. Gov't of Nashville and Davidson County Tennessee*, 129 S. Ct. 846, 851 (2009) (ellipses in original omitted). In order to satisfy this prong of a retaliation claim, the plaintiff need only have a good faith reasonable belief that he was opposing an employment practice made unlawful by Title VII." *Kessler,* 461 F.3d at 210; *see Everson v. New York City Transit Auth.*, 2007 WL 539159, at *27 (E.D.N.Y. Feb. 16, 2007) ("protected activity . . . refers to any action taken to oppose statutorily prohibited discrimination"). Additionally, "in satisfying the knowledge requirement, only general corporate knowledge that the plaintiff engaged in a protected activity is necessary." *Id.*

Viewing the evidence in the light most favorable to Plaintiff, as the Court must, there is sufficient evidence that Adams engaged in protected activity. The letter from Adam's attorney, as well as Adams' complaint to the EEOC, constitute protected activity. *See Lamberson v. Six West Retail Acquisition Inc.,* 122 F. Supp. 2d 502, 511 (S.D.N.Y. 2000) ("Protected oppositional activities include informal as well as formal complaints and complaints to management"); *cf. Crawford*, 129 S. Ct. at 851.

Plaintiff maintains that the adverse employment action she suffered was Canon's failure to rehire her into any of the DAE positions that became available after her termination. There is no dispute that Plaintiff was not hired into any of these positions.

Turning then to the issue of a causal link, Plaintiff maintains that this element is satisfied because her protected activity, which occurred in June 2006 (her attorney's letter) and again in October 2006 (the filing of her EEOC complaint), was closely followed by the discriminatory treatment. It is true that "proof of causation may be shown . . . indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . ." *Gordon v. New York*

*City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Here, however, no such causal link may be drawn. As Defendant aptly points out, Plaintiff never applied for any of the DAE positions that because available after her termination. The Court rejects Plaintiff's argument that since her counsel's letter sought her job or a similar position, the eventual hiring of additional DAEs between June 2006 and October 2006, positions for which plaintiff was qualified but not considered, was retaliatory. It would be unwise and unsound for this Court to hold that an attorney's letter charging discrimination and demanding the client's return to the same or similar position constitutes an application to any position for which the client might be qualified. To do so would place an unwarranted burden on employers, especially employers such as Canon who make no representations to those whose positions are eliminated as to eligibility for rehire or priority consideration for open positions. As Plaintiff failed to submit applications for any of these DAE positions, her retaliation claim fails. *Cf. Brown v. Coach Stores*, 163 F.3d 706, 710 (2d Cir. 1998) ("[A] plaintiff [must] allege that she or he applied for a specific position or positions, and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion."); *Morris v. Ales Group USA, Inc.*, 2007 U.S. Dist. LEXIS 47674, at *25-26 (S.D.N.Y. June 28, 2007) (plaintiff's claims that there were positions that she "expressed her interest and/or qualifications for" and that she had "expressed an interest in anything that her resume listed" was not a substitute for applying to position); *see also Jones v. Western Suffolk BOCES*, 2008 U.S. Dist. LEXIS 13077, at *30-31 (E.D.N.Y. Feb. 20, 2008), *aff'd*, 2009 U.S. App. LEXIS 17125 (2d Cir. Aug. 3, 2009).

Plaintiff also claims that not considering her for the new Regional Field Analysts ("RFAs") positions suggests retaliatory discrimination for her engagement in protected activity.

In or about December 2006, RFAs were added to the CBS sales channel. Prior to that time, they did not report to the managers of the DAEs, but instead comprised a separate group within Canon, reporting to their own manager who was responsible for hiring RFAs. (Def. 56.1 174, 179.) RFAs are product experts with very high technical backgrounds and networking capability. Unlike DAEs, who focus more on coordinating activities, launches, open house support, sales calls and other areas in which a dealer needs support, RFAs are specialists brought in to advise customers with respect to integrated sales that require more expertise in systems and IT infrastructure. (*Id.*¶ 175.) Plaintiff never worked as an RFA at Canon and never personally applied to any RFA position at Canon. Neither Sokol nor Alicata was aware of any interest by Plaintiff in any RFA position. (*Id.* ¶¶ 177-78.)

The evidence is insufficient to permit the trier of fact to conclude that Defendant's failure to consider her for these new RFA positions was in retaliation for her protected activity. First, Plaintiff points to no evidence that she was qualified, i.e. that she had expertise in systems and IT infrastructure. Second, she never personally applied for these positions.

The motion for summary judgment on Plaintiff's retaliation claim is granted.

## V. The New York State Human Rights Law Claims

Plaintiff also claims that Canon violated the NYSHRL by engaging in discrimination and retaliation. These claims too must fail.

Discrimination and retaliation "claims under the NYSHRL are analyzed identically to claims under . . . Title VII" and "the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII." *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999); *accord Schiano v. Quality Payroll Sys. Inc.*, 445 F.3d 597, 609

(2d Cir. 2006). Thus, NYSHRL claims are generally considered "in tandem" with Title VII claims, *see Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999), and a district court need not explicitly evaluate a plaintiff's NYSHRL claims where it has thoroughly analyzed the plaintiff's Title VII claims. *Smith*, 196 F.3d at 363 n.1. In the present case, as Plaintiff has failed to present sufficient evidence to permit the trier of fact to conclude that Canon engaged in discrimination or retaliation under Title VII, she has ipso facto failed to present sufficient evidence to permit the trier of fact to conclude that Canon engaged in discrimination or retaliation under the NYSHRL as well. Summary judgment is granted in favor of Canon on the NYSHRL claims.

## Conclusion

For the reasons set forth above, Defendant's motion for summary judgment is granted. The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
September 22, 2009

/s/_____
Denis R. Hurley
Senior District Judge